

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 19, 2022**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 19-40831-ELM |
| DENNIS WAYNE LINDEMAN and | § | |
| DONNA ELIZABETH GORDON, | § | Chapter 7 |
| | § | |
| Debtors. | § | |
| WILLIAM T. NEARY, | § | |
| United States Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| DENNIS WAYNE LINDEMAN and | § | |
| DONNA ELIZABETH GORDON, | § | |
| | § | |
| Defendants. | § | Adversary No. 19-04103 |
| BRYAN TAYLOR, | § | |
| | § | |
| Intervenor Plaintiff, | § | |
| v. | § | |
| | § | |
| DENNIS WAYNE LINDEMAN and | § | |
| DONNA ELIZABETH GORDON, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION

The federal bankruptcy system is designed to provide the honest but unfortunate debtor with the opportunity to obtain a fresh financial start.[1]  As framed by the Supreme Court, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[2]  The fresh financial start contemplated by the Bankruptcy Code is effectuated through a discharge of indebtedness.  In chapter 7, the discharge is provided by section 727 of the Bankruptcy Code.[3]

Importantly, the bankruptcy system is dependent upon a debtor's complete, truthful and timely disclosure of financial information – information with respect to, among other things, the debtor's assets, liabilities and financial affairs.  Without such timely financial transparency, the bankruptcy system cannot properly function.  In chapter 7, for example, a debtor's lack of honest and timely participation increases the likelihood that less than all the debtor's non-exempt assets have been disclosed and committed to the bankruptcy liquidation process for the benefit of creditors who nearly always stand to recover less than the full amount of their claims.  It is for these reasons that some have described the discharge in bankruptcy as a privilege reserved for only those debtors who engage in the bankruptcy process in an honest, forthright and timely manner.[4]  For those who fail or refuse to do so, the Bankruptcy Code sets out a number of grounds for the denial of a discharge.[5]

---

[1] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

[2] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[3] *See* 11 U.S.C. § 727(a); *see also id*. § 524(a) (provision giving effect to discharge).

[4] *See In re Tabibian*, 289 F.2d 793, 795 (2nd Cir. 1961) ("a discharge is a privilege granted the honest debtor and not a right accorded to all bankrupts"); *see also United States v. Johnston*, 267 B.R. 717, 722-23 (N.D. Tex. 2001), *aff'd*, 48 Fed. Appx. 917 (5th Cir. 2002).

[5] *See* 11 U.S.C. § 727(a)(2)-(a)(7) (grounds for the denial of a discharge in chapter 7).

With that framework in mind, in this adversary proceeding Plaintiff William T. Neary (the "**U.S. Trustee**"), the United States Trustee for the region that includes the Northern District of Texas, and Intervenor Plaintiff Bryan Taylor ("**Taylor**"), a creditor of Defendants Dennis Wayne Lindeman ("**Lindeman**") and Donna Elizabeth Gordon ("**Gordon**" and together with Lindeman, the "**Debtors**") in Case No. 19-40831, the Debtors' joint chapter 7 bankruptcy case (the "**Bankruptcy Case**"), object to the provision of a bankruptcy discharge to the Debtors because of the Debtors' alleged failure to engage in the bankruptcy process in an honest, forthright and timely manner. Specifically, the U.S. Trustee and Taylor (collectively, the "**Plaintiffs**") object to the discharge pursuant to sections 727(a)(4)(A) and 727(a)(3) of the Bankruptcy Code, asserting that the Debtors knowingly and fraudulently made a false oath or account in connection with the Bankruptcy Case and failed to keep and preserve books and records from which the Debtors' business transactions and financial condition may be ascertained. The Debtors dispute such contentions, asserting that they did not knowingly make any false oaths or accounts, that any false oaths or accounts made were made without any fraudulent intent on their part, and that they have maintained and produced adequate records with respect to their business transactions and financial condition. Therefore, they assert that they are entitled to the discharge relief sought.

The Court conducted a three-day trial in this proceeding between November 30 and December 2, 2020. Having now considered the U.S. Trustee's Complaint,[6] Taylor's joinder therein,[7] the Debtors' Answer,[8] the parties' respective contentions and joint factual stipulations

---

[6] Docket No. 1.

[7] *See* Docket Nos. 9 and 12 (Taylor's motion to intervene and agreed order permitting the intervention).

[8] Docket No. 5.

(the "**Joint Stipulations**") from the Joint Pre-Trial Order,[9] the parties' other pretrial submissions,[10] the evidence introduced at trial, and the arguments of counsel, the Court now issues its findings and conclusions pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[11]

## *JURISDICTION*

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(J).

## *FACTUAL BACKGROUND*

The Debtors are a married couple. As of the time of trial, Lindeman was employed as an insurance agent selling health insurance. He obtained his license to sell health insurance in 2008.[12] As of February 28, 2019, the date of the Debtors' bankruptcy filing (the "**Petition Date**"), however, Lindeman was solely engaged in the business of home construction and renovation.[13] In

---

[9] *See* Docket No. 42 (the "**PTO**"), at pp.17-28 (setting out Joint Stipulations). Importantly, there are two paragraph numbering errors within the Joint Stipulations. First, on page 21 of the PTO, the paragraph numbering reverts from paragraph 33 to paragraph 27. Then, on pages 22-23 of the PTO, the paragraph numbering jumps from paragraph 30 to paragraph 34. Thus, the result is that there are two sets of paragraphs 27, 28, 29 and 30 within the Joint Stipulations of the PTO. To minimize confusion, the Court has included a page number reference when citing any of paragraphs 27, 28, 29 or 30 of the Joint Stipulations.

[10] *See* Docket Nos. 35 and 44.

[11] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

[12] *See* Exh. UST-8 (p.7).

[13] *See* Exh. UST-1 (p.50).

the case of Gordon, as of the time of trial she was employed as a full-time law firm paralegal.[14] As of the Petition Date, however, Gordon was working as both a law firm paralegal and a real estate agent.[15] In the latter case, she worked through VIP Realty ("**VIP**"), having obtained her real estate license in 2013.[16] Her arrangement with VIP was such that she was entitled to retain 100% of the commissions earned on listings that she brought to VIP and 50% of the commissions earned on listings referred to her by another broker.[17]

## A. *The Debtors' Prepetition Home Remodeling Business*

Prior to the Petition Date, the Debtors owned and operated a home remodeling business. Their involvement in such business started after they attended a FortuneBuilders seminar that educated attendees on how to invest in and flip properties without using one's own money.[18] In 2012, following the seminar, the Debtors organized Snappy Real Estate Investors, LLC ("**SRE**") as the first entity through which they would conduct their house renovation and resale business.

The business model utilized by the Debtors was fairly straight forward. First, on a project-by-project basis, the Debtors would obtain a secured loan from a hard money lender to finance the bulk of the acquisition costs of a targeted residential home. Then, to fund the expenses of hired contractors and construction supplies for the renovation projects and to finance the operation of the business overall (including, from time to time, a portion of the acquisition costs of targeted homes), the Debtors would, on a rolling basis, raise capital from individual investors willing to provide unsecured, high interest investment loans backed by the Debtors' individual guarantees.

---

[14] Gordon obtained her undergraduate degree in Criminal Justice from Stephen F. Austin State University. *See* Exh. UST-9 (pp.5-6). By the time of the Petition Date, she had been working as a paralegal for approximately 13 years. *See* Exh. UST-1 (p.50).

[15] *See* Exh. UST-1 (pp.50-51).

[16] *See* Exh. UST-9 (p.7)

[17] *See id*. (p.29).

[18] *See* Exhs. UST-8 (pp.8-9) and UST-9 (p.62).

The Debtors found these individual lenders in family members and friends, and through networking, word of mouth, and Lindeman's involvement with a "Masterminds" Meetup group focused on real estate investment.[19]  Finally, upon the resale of each renovated property, the associated hard money loan would be paid off and then the balance of the sales proceeds (if any) would be available to repay outstanding individual investment loans.  Naturally, key to the success of the business and, more specifically, the ability to repay the individual investment loans was the resale of renovated homes for amounts greater than the costs of their acquisition and renovation.

In the case of SRE, the Debtors struggled to achieve gains upon resale and after only a few years of operation, SRE found itself in financial trouble.  Ultimately, in an effort to buy additional time to complete pending projects and resales, the Debtors caused SRE to obtain certain short-term merchant loans secured by SRE's accounts receivable.  When this strategy failed to pan out and SRE defaulted on the loans, the merchant lenders began to take action to garnish SRE's bank accounts.[20]  Initially, the Debtors attempted to frustrate the garnishment by having SRE open new accounts.  But when the merchant lenders caught up to the changes and began garnishing the new accounts, the Debtors sought to fully evade the lenders by repositioning the business in an entirely new entity with a different name.[21]

Accordingly, on April 11, 2016, the Debtors organized Pinnacle Investment Properties, LLC ("**Pinnacle**"), an entity jointly owned by the Debtors with Lindeman assigned a 90% membership interest and Gordon assigned a 10% membership interest.  Between the time of its organization and the Petition Date, Pinnacle was primarily managed by Lindeman.[22]  Because Gordon intended to act as Pinnacle's real estate agent on renovated home resales to earn

---

[19] Joint Stipulations ¶¶ 38-39.

[20] *See* Exh. UST-8 (pp.11-12).

[21] *See id.* (p.12).

[22] *See id.* (p.15).

commissions in such capacity, she attempted to distance herself from the day-to-day management of the company.[23] But Gordon did handle the bookkeeping side of the operation with informational input from Lindeman.[24]

In this regard, Pinnacle did not maintain a separate bank account for each renovation project.[25] Instead, the Debtors used QuickBooks to record and track Pinnacle's income and expenses on a project-by-project basis. Between 2017 and the Petition Date, Pinnacle's QuickBooks records were maintained by Gordon.[26] While Gordon testified that such QuickBooks records were "pretty accurate,"[27] the bookkeeping methodology utilized by the Debtors between 2017 and Petition Date was rather reactionary and dependent upon after-the-fact reconstruction. For example, in response to expense tracking questions posed by counsel for the U.S. Trustee, while the Debtors explained that certain expenses were contemporaneously input into QuickBooks, they also explained that to determine the construction material expenses incurred on an individual project, they would need to go back through online purchasing information maintained by Home Depot, emailed receipts from vendors, and any retained paper receipts that they might have.[28] And in the case of contractor labor costs, because the contractors were often simultaneously working on more than one project at a time and were paid in lump sums for all pending project work, the process of allocating such costs was more challenged.[29] Moreover,

---

[23] *See* Exh. UST-9 (pp.10-11).

[24] *See id*. (pp.12, 50).

[25] *See* Exh. UST-8 (p.18).

[26] *See* Exh. UST-9 (p.57).

[27] *Id*.

[28] *See* Exhs. UST-8 (pp.18, 64-69, and 74) and UST-9 (p.13).

[29] *See* Exh. UST-9 (p.13).

about 10% of the contractors were paid in cash without any sort of paper trail at all.[30]  According to Lindeman, Pinnacle paid them in this manner to achieve "better deals to save cost."[31]

## B.     The Prepetition Pinnacle Renovation Projects

Following the FortuneBuilders business model, Pinnacle raised capital for its operations and projects through both hard money loans and individual investment loans.  In the case of the hard money loans, Pinnacle primarily looked to Pavillion Bank ("**Pavillion**") and American National Investment Corporation ("**American**").[32]  In the case of the individual investment loans (collectively, the "**Individual Loans**"), among the individuals who provided financing to Pinnacle backed by the Debtors' personal guarantees (collectively, the "**Individual Loan Guarantees**") were Taylor, Art Martinez (through ReCharge REI, LLC), Rosemary Geramita, John Stefan, Wanda Wachowski, David Stagg, Allen Mimms, Ronnie Mimms, Jennifer Mimms, Cory Mull, Jim Townsend, David Stermer ("**Stermer**") (through LOF Enterprises, LLC ("**LOF Enterprises**")), Gary Thumann, and Steve Holy (collectively, the "**Individual Investors**").[33] While the maturity of an Individual Loan was often tied to the date of sale of a particular project property, the Debtors more or less used the proceeds of the Individual Loans wherever they deemed they were needed to finish projects.[34]

Prior to the Petition Date, Pinnace acquired and worked on each of the following six renovation project properties (collectively, the "**Pinnacle Project Properties**"):[35]

---

[30] *See id*. (p.43); *see also* Joint Stipulations ¶ 83.

[31] Joint Stipulations ¶ 83.

[32] *See* Exhs. UST-32 (p.5), UST-33 (p.1), UST-34 (p.1), UST-35 (p.1), UST-36 (p.1), and UST-37 (p.2).

[33] *See, e.g.*, Exhs. UST-32 (pp.3-4, 9), UST-36 (p.5), UST-37 (pp.12-13, 18-19), UST-46, UST-47, UST-49, UST-50, UST-51, UST-52, UST-54, UST-55, and UST-9 (p.24).

[34] *See* Exh. UST-9 (p.59).

[35] Joint Stipulations ¶ 31; *see also* Exhs. UST-32, UST-33, UST-34, UST-35, UST-36, and UST-37.

> 6158 Marquita Drive ("**Marquita**")
> 7266 Tangleglen Place ("**Tangleglen**")
> 4739 Harvest Hill ("**Harvest Hill**")
> 810 Clearwater ("**Clearwater**")
> 8618 Groveland Drive ("**Groveland**")
> 6522 Laurel Valley ("**Laurel Valley**")

Of note, during a portion of the period during which Pinnacle owned the Tangleglen property – specifically, from February 7, 2017 through March 2018 – the Debtors lived in the property.[36] During their period of occupancy, the Debtors incurred various home-related personal expenses, including water and sewage service from the City of Dallas,[37] natural gas service from Atmos,[38] electrical service from TXU Energy,[39] and mosquito repellant service from Terminix,[40] all of which services were paid by Pinnacle.  No evidence was introduced of the Debtors' payment of any rent to Pinnacle for the period of occupancy or of the reimbursement of Pinnacle for any of the personal expenses incurred.

### C.    The Debtors Set Up Renovations at Work

Approximately a year after organizing Pinnacle, the Debtors determined to diversify by organizing another entity to handle construction.  As explained by Lindeman, he had gotten tired of having to pay other contractors to handle the home renovations work and he believed that it could be done at a better cost if managed internally.[41]  The Debtors determined to set up the new entity as a subsidiary of Pinnacle.  Stermer, one of the Individual Investors (through LOF Enterprises), agreed to partner with the Debtors on the project through one of his companies –

---

[36] Joint Stipulations ¶ 43.

[37] *See* Debtors' Tangleglen Exhs. 553-562, 566-567.

[38] *See* Debtors' Tangleglen Exh. 568-576, 578-582.

[39] *See* Debtors' Tangleglen Exhs. 583-606.

[40] *See* Debtors' Tangleglen Exh. 537.

[41] *See* Exh. UST-8 (pp.13-14).

either LOF Enterprises (the entity through which he had made individual investment loans to Pinnacle) or Leap of Faith, Inc. ("**LOF**").[42]

Thus, on June 30, 2017, Pinnacle and LOF/LOF Enterprises organized Renovations at Work, LLC ("**Renovations**") to serve as this new construction company, with each of Pinnacle and LOF/LOF Enterprises to own a 50% interest in the company.[43]  With respect to management, Stermer was appointed as a director of the company and Lindeman was appointed as the manager of the company.[44]  Overall, the Renovations business was primarily managed by Lindeman.[45]  In 2018, Lindeman also began to be paid as a regular employee of Renovations.

Between 2017 and 2019, Renovations had at least four different construction projects.[46] One of the 2019 projects involved a Construction Contract with Winson Industries, LLC ("**Winson**"), dated February 20, 2019 (eight days before the bankruptcy filing) (the "**Winson Contract**").  Lindeman executed the Winson Contract on behalf of Renovations.  Under the Winson Contract, Renovations agreed to complete construction work on a property located at 5815 Ravendale Lane, Dallas, Texas in exchange for Winson's payment of $167,750.[47]

D.      ***Pinnacle Experiences Financial Trouble and the Debtors Again Attempt To Buy Time with Merchant Loans and with a Pavillion Line of Credit***

By early 2018, less than two years after its organization, Pinnacle began to experience financial trouble.  While continuing to solicit Individual Loans,[48] the Debtors also again sought to

---

[42] The parties have stipulated that both LOF and LOF Enterprises partnered with Pinnacle in setting up Renovations. *See* Joint Stipulations ¶¶ 26 (referring to LOF) and 75 (referring to LOF Enterprises); *see also* Joint Stipulations ¶ 27 (PTO, at p.20) (identifying LOF as an entity owned by Stermer).

[43] *See* Joint Stipulations ¶¶ 25, 26 and 75; *see also* Exh. UST-8 (pp.13, 82).

[44] *See* Joint Stipulations ¶¶ 28 and 29 (PTO, at p.20).

[45] *See* Exh. UST-8 (p.15).

[46] *See* Exh. UST-8 (p.13).

[47] *See* Exh. UST-41.

[48] *See, e.g.*, Exhs. UST-44 (promissory note related to Individual Loan obtained in or about December 2018), UST-45 (promissory note related to Individual Loan obtained in or about January 2019), and UST-48 (promissory note related to Individual Loan obtained in or about December 2018).

buy time by having Pinnacle take out several new short-term merchant loans. In particular, between January and February 2018, Pinnacle borrowed an aggregate of $140,000 from the following four out-of-state merchant lenders (collectively, the "**Merchant Lenders**"): a $45,000 loan from Green Capital Funding, LLC on or about January 14, 2018; a $45,000 loan from CFG Merchant Solutions on or about January 25, 2018; a $25,000 loan from Ace Funding Source on or about February 23, 2018; and a $25,000 loan from Empire Funding on or about February 26, 2018 (collectively, the "**Merchant Loans**").[49] To secure Pinnacle's repayment of the loans, not only did Lindeman provide a personal guarantee for each of the loans (collectively, the "**Merchant Loan Guarantees**"), but the Merchant Lenders were granted an interest in Pinnacle's accounts receivable and the authority to make withdrawals from Pinnacle's Pavillion bank account ending in 4195 (the "**Pavillion 4195 Account**").

Separately, with the assistance of Taylor, Pinnacle secured a $100,000 line of credit from Pavillion. In addition to the Debtors' guaranty of the line (the "**Pavillion Line Guaranty**"), Taylor also provided a guaranty (the "**Taylor Guaranty**"). He did so because (through LOF Enterprises) he was still owed quite a bit of money on an Individual Loan(s), Lindeman had told him that Pinnacle would not be able to finish the outstanding Project Properties without the financing, and Taylor wanted to save the projects.

## E. Pinnacle Defaults, the Merchant Lenders Begin Collection Efforts, and the Debtors Take Steps to Frustrate Such Efforts

Despite the Debtors' effort to bridge over Pinnacle's liquidity problems with the Merchant Loans and Pavillion line of credit (plus additional Individual Loans), Pinnacle continued to struggle. Ultimately, when Pinnacle defaulted on the Merchant Loans, the Merchant Lenders

---

[49] *See, e.g.*, Exhs. UST-29, UST-30, and UST-31; *see also* Joint Stipulations ¶¶ 51-55.

began to pursue collection remedies, including the debiting of the Pavillion 4195 Account.  It was at this point that the Debtors again took steps to evade such collection efforts.

> **1.** **The Debtors' Transfer of Pinnacle Funds to Other Accounts**

Initially, the Debtors sought to limit the impact of the garnishment efforts by simply transferring funds on deposit in Pinnacle's Pavillion 4195 Account to other accounts.  For example, at least $80,000 was transferred from the Pavillion 4195 Account to a Renovations account.[50]  And at least $26,000 was temporarily moved from the Pavillion 4195 Account to Gordon's BBVA Compass account ending in 6434 (the "**BBVA 6434 Account**").[51]

> **2.** **The Debtors Transition the Pinnacle Business to Their Personal Accounts**

Because the Merchant Lenders continued with their garnishment efforts, however, eventually the Debtors decided to simply close the Pavillion 4195 Account[52] and run all Pinnacle business through their individual accounts, including Lindeman's account at Pavillion ending in 3285 (the "**Pavillion 3285 Account**"), Lindeman's account at Bank of America ending in 0654 (the "**BOA 0654 Account**"), Gordon's BBVA 6434 Account, Gordon's account at BBVA ending in 7675 (the "**BBVA 7675 Account**"), and Gordon's Unify account ending in 9276 (the "**Unify 9276 Account**") (collectively, the "**Personal Accounts**").[53]  Thereafter, the Debtors deposited Pinnacle funds into, and paid Pinnacle creditors out of, the Personal Accounts.[54]  At the same time, however, the Debtors continued to use the Personal Accounts for their personal purposes.[55]

---

[50] *See* Exhs. UST-8 (pp.60-64) and UST-9 (p.52).

[51] *See* Exh. UST-9 (pp.36-38).

[52] *See id.* (p.49).

[53] *See id.* (pp.36-42) and UST-8 (pp.48, 70).

[54] *See* Exh. UST-9 (pp.50, 56); *see also* Joint Stipulations ¶¶ 47 and 49.

[55] *See* Exhs. UST-8 (pp.48, 70), UST-9 (pp.36-37, 39, 41-42), UST-22, UST-23, UST-24 and UST-25.

During the one-year period of February 28, 2018 through February 28, 2019 (the Petition Date), over $1.3 million in funds were deposited into the Personal Accounts, including approximately $715,000 into Lindeman's Pavillion 3285 Account, approximately $375,000 into Gordon's Unify 9276 Account, approximately $170,000 into Gordon's BBVA 6434 Account, and approximately $55,000 into Lindeman's BOA 0654 Account.[56]   During this same time frame, in addition to making a variety of Pinnacle business expense payments by checks drawn on the Personal Accounts (ostensibly enabling the Debtors to construct a reliable accounting of the business expenses paid based upon the checks), the Debtors also withdrew large sums of cash from the Personal Accounts,[57] including Lindeman's withdrawal of the following amounts from the Pavillion 3285 Account: $10,200 in August 2018; $19,605 in September 2018; and $14,005 in October 2018.[58]   To the extent that some or all of a particular cash withdrawal was used for Pinnacle business expenses, any accounting of the business expenses paid thereby is less than reliable in the absence of a contemporaneous receipt or other documentary evidence.

### 3. The Debtors Transfer Projects Away from Pinnacle and Begin to Conduct Business in Their Own Name

Finally, with respect to existing and new projects, the Debtors both transferred projects away from Pinnacle to Renovations[59] and began to acquire new project properties in their own name instead of in Pinnacle's name.[60]   In the latter case, prior to the Petition Date the Debtors acquired and worked on each of the following two project properties (collectively, the "**Debtor**

---

[56] Joint Stipulations ¶ 47.

[57] Joint Stipulations ¶ 81.

[58] Joint Stipulations ¶ 82.

[59] *See, e.g.*, Exh. UST-9 (p.52).

[60] *See* Exh. UST-8 (pp.42-43).

Project Properties" and together with the Pinnacle Project Properties, the "**Project Properties**"):[61]

> 2617 Winnpage Road ("**Winnpage**")
> 615 Via Sonoma ("**Via Sonoma**")

In the case of the Winnpage property, following the Debtors' default on the loan provided by American to finance the Debtors' acquisition of the property, the Debtors allegedly reached an agreement with American to transfer the property to one of American's affiliates in lieu of a foreclosure and on or about February 4, 2019, less than a month prior to the Petition Date, the Debtors transferred the property to American's alleged affiliate YYP Funds, Inc.[62] In the case of the Via Sonoma property, on or about February 11, 2019, roughly two weeks prior to the Petition Date, the Debtors sold the property to Donald Tarver for $189,000.[63] At the closing, net proceeds of $19,301.73 were disbursed to the Debtors.[64] Additionally, Gordon received $5,420 in real estate commissions.[65] While Gordon testified that she believed that the net proceeds of sale were put back into the remodeling business,[66] Lindeman more specifically testified that the Debtors used roughly $10,000 of the proceeds to fund deposits required for their new leased residence and that the balance of the funds was used to pay for movers and to pay for legal fees associated with the bankruptcy filing.[67]

---

[61] Joint Stipulations ¶ 31; *see also* Exhs. UST-38 and UST-39.

[62] *See* Exh. UST-39 (pp.5-6).

[63] *See* Exhs. UST-9 (p.67) and UST-38 (p.1).

[64] Exh. UST-38 (p.1).

[65] *See* Exh. UST-20.

[66] *See* Exh. UST-9 (p.68).

[67] *See* Exh. UST-8 (pp.43-44).

**F.        The Debtors' Bankruptcy Filing**

Ultimately, finding themselves to be overleveraged, unable to keep up with their loan guaranty obligations, and facing litigation that had been commenced against them, the Debtors decided to pursue bankruptcy relief.[68]  In early 2019, the Debtors hired the Lee Law Firm, PLLC to represent them in connection with the bankruptcy filing.

In preparation for the filing, both of the Debtors participated in providing information for their schedules of assets and liabilities ("**Schedules**") and statement of financial affairs ("**SOFA**") and in the gathering of pertinent financial documentation in relation thereto.[69]  Prior to the filing, the Debtors met with Eric Maskell ("**Maskell**"), the Lee Law Firm attorney assigned to head up the representation.  During the meeting, Maskell reviewed all the information listed in the draft Schedules (the "**Original Schedules**") and draft SOFA (the "**Original SOFA**") with the Debtors and asked the Debtors if the information provided in the Original Schedules and Original SOFA was correct.[70]  The Debtors affirmed that the information set out in the Original Schedules and Original SOFA was true and accurate.  Then the Debtors signed their joint voluntary petition for relief under chapter 7 of the Bankruptcy Code and signed the Original Schedules and Original SOFA.

On February 28, 2019, the Debtors filed their joint voluntary bankruptcy petition to initiate the Bankruptcy Case.  By and through the Bankruptcy Case, the Debtors seek the discharge of at least $1.8 million in general unsecured claims, including all personal liability on the Individual Loan Guarantees, the Merchant Loan Guarantees, and the Pavillion Line Guaranty.[71]

---

[68] *See* Exhs. UST-8 (pp.50-51) and UST-9 (pp.8, 16-17).

[69] *See* Exhs. UST-8 (p.52) and UST-9 (pp.17 and 28).

[70] *See also* Exh. UST-8 (pp.52, 55-56).

[71] *See* Exh. UST-1; Joint Stipulations ¶¶ 57 and 80.

### G.      The Debtors' Original Schedules

The Original Schedules were filed along with the bankruptcy petition.[72]  In signing the Original Schedules, each of the Debtors verified that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."[73]  Based upon the business background of the Debtors, the Debtors understood the significance of such verification and the ramifications of providing false or incomplete information.  In this regard, both of the Debtors had previously completed the necessary educational and testing requirements to become licensed professionals – Lindeman having previously obtained his license to sell insurance and Gordon having previously obtained her real estate license (in addition to having multiple years of paralegal experience).

In the Original Schedules, Lindeman is identified as "Debtor 1" and Gordon is identified as "Debtor 2."[74]  The Debtors disclosed the following information within the Original Schedules:

### 1.      Assets (Original Schedule A/B)

First, with respect to assets, the Debtors averred in Schedule A/B of the Original Schedules that total cash on hand and funds on deposit as of the Petition Date was $9,071.52, including: total cash on hand of $1,175; a total of $989 in the Unify 9276 Account; a total of $6,500 in the BBVA 7675 Account; a negative balance in the BOA 0654 Account; and a total of $261.88 in the Pavillion 3285 Account.[75]

---

[72] *See* Exh. UST-1 (Original Schedules); Joint Stipulations ¶ 3.

[73] Exh. UST-1 (Original Schedules, ECF p.50 of 90).

[74] *See* Joint Stipulations ¶ 42.

[75] *See* Exh. UST-1 (Schedule A/B, Items 1, 16 and 17).

Second, with respect to business property, the Debtors averred in Schedule A/B of the Original Schedules that, as of the Petition Date, they owned a 100% ownership interest in both Pinnacle and Renovations but that both ownership interests were worth nothing.[76]

### 2. *Business Debts and Codebtors (Original Schedules E/F and H)*

Next, with respect to business debts, the Debtors disclosed in Schedule E/F of the Original Schedules that they owed the following non-priority, unsecured business debts, totaling $1,583,000, as of the Petition Date:[77]

Individual Investor Claims

| | |
|---|---|
| Allen Mimms | $  85,500 |
| Bryan Taylor | $100,000 |
| Cory Mull | $  40,000 |
| Gary Thumann | $  55,000 |
| James Townsend | $350,000 |
| Jennifer Mimms | $146,500 |
| John Stefan & Wanda Wachowski | $100,000 |
| LOF Enterprises | $540,000 |
| Ronnie Mimms | $  30,000 |
| Rosemary Geramita | $  36,000 |
| Steve Holy | $        0 |

Merchant Lender Claims

| | |
|---|---|
| CFG Merchant Solutions, LLC | $0 |
| Empire Funding | $0 |
| Green Capital Funding, LLC | $0 |

Pavillion Line of Credit Claim

| | |
|---|---|
| Pavillion Bank | $100,000 |

In relation to such "business debts," the Debtors separately averred on Schedule H of the Original Schedules that they had no codebtors as of the Petition Date.  In relation to such disclosure, Schedule H explains that "[c]odebtors are people or entities who are also liable for any

---

[76] *See* Exh. UST-1 (Schedules A/B, Item 42).

[77] *See* Exh. UST-1 (Schedule E/F, Items 4.2, 4.10, 4.15, 4.26, 4.27, 4.31, 4.33, 4.34, 4.38, 4.39, 4.40, 4.44, 4.47, 4.51, 4.52, and 4.53).

debts you may have."[78] Schedule H further emphasizes that "[i]f two married people are filing together, both are equally responsible for supplying correct information."[79]

### 3. Employment and Income (Original Schedule I)

A debtor is required in Schedule I of the Schedules to disclose the debtor's current employment and monthly income as of the date of the filing of the schedule. As with Schedule H, the introductory language of Schedule I explains that "[i]f two married people are filing together …, both are equally responsible for suppling correct information."[80]

Pursuant to Schedule I of the Original Schedules, the Debtors disclosed that Lindeman was self-employed in construction and was making approximately $657 per month in gross income in the form of residual insurance sales commissions and income from construction projects. No other employment or income was disclosed for Lindeman.[81]

### H. The Debtors' Original SOFA

The SOFA is designed to, among other things, obtain a debtor's disclosure of prepetition income, certain types of prepetition transfers, and the debtor's ownership and/or control of any businesses. Similar to the Schedules, the introductory language of the SOFA explains that "[i]f two married people are filing together, both are equally responsible for suppling correct information."[82] The Original SOFA was filed along with the Debtors' bankruptcy petition.[83] In signing the Original SOFA, the Debtors each verified that "I have read the answers on this

---

[78] *See* Exh. UST-1 (Schedule H, introductory instructions).

[79] *See id.*

[80] *See* Exh. UST-1 (Schedule I, introductory instructions).

[81] *See* Exh. UST-1 (Schedule I).

[82] *See* Exh. UST-1 (SOFA, introductory language on first page).

[83] *See* Exh. UST-1 (Original SOFA); Joint Stipulations ¶ 3.

*Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that answers are true and correct."[84]

In the Original SOFA, Lindeman is again identified as "Debtor 1" and Gordon is identified as "Debtor 2."[85]  The Debtors disclosed the following information within the Original SOFA:

### 1.    *Prepetition Income (Original SOFA Questions 4 and 5)*

Question 4 of the SOFA requires a debtor's disclosure of income from employment and from operating a business during the year of the bankruptcy filing and during the two previous calendar years.  It instructs a debtor to fill in the total amount of income received from all jobs and all businesses, including part-time activities.[86]

In response to Question 4, the Debtors disclosed that all of their gross income in 2017, 2018, and the prepetition period of 2019 came from operating a business (*i.e.*, that neither of them received any wages, commissions, bonuses or tips) and that their gross income during such period was as follows:[87]

|  | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
|  | Sources of income<br>Check all that apply. | Gross income<br>(before deductions<br>and exclusions | Sources of income<br>Check all that apply. | Gross income<br>(before deductions<br>and exclusions |
| From January 1 of the current year until the date you filed for bankruptcy: | ☐ Wages, commissions, bonuses, tips<br>☑ Operating a business | $804.00 | ☐ Wages, commissions, bonuses, tips<br>☑ Operating a business | $12,316.00 |
| For the last calendar year:<br>(January 1 to December 31, __2018__ )<br><span style="font-size:smaller">YYYY</span> | ☐ Wages, commissions, bonuses, tips<br>☑ Operating a business | $21,651.00 | ☐ Wages, commissions, bonuses, tips<br>☑ Operating a business | $126,241.00 |
| For the calendar year before that:<br>(January 1 to December 31, __2017__ )<br><span style="font-size:smaller">YYYY</span> | ☐ Wages, commissions, bonuses, tips<br>☑ Operating a business | $13,106.00 | ☐ Wages, commissions, bonuses, tips<br>☑ Operating a business | $119,665.00 |

---

[84] *See* Exh. UST-1 (Original SOFA, ECF p.69 of 90) (emphasis in orig.).

[85] *See* Joint Stipulations ¶ 42.

[86] *See* Exh. UST-1 (SOFA, Question 4).

[87] *Id.*

Question 5 of the SOFA requires a debtor's disclosure of any other income during the same time frame. It instructs a debtor to include income regardless of whether the income is taxable.[88] In response to Question 5, the Debtors disclosed that they had no other income in 2017, 2018, and the prepetition period of 2019.[89]

### 2. Prepetition Payments on Debts Owed to Insiders (Original SOFA Question 7)

Question 7 of the SOFA requires a debtor's disclosure of payments made within 1 year of the bankruptcy filing on debts owed to an insider. The instructions to the question explain that an "insider" includes "your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor."[90]

In response to Question 7, the Debtors disclosed the following insider debt payments within 1 year of the bankruptcy filing:[91]

| | |
|---|---|
| Jennifer Mimms | $5,000 |
| Allen Mimms | $1,000 |
| Ronnie Mimms | $2,000 |

Each of these individuals is a relative of the Debtors. The Debtors also listed payments of $1,600 to Cory Mull, a close friend of the Debtors.[92]

### 3. Prepetition Payments or Transfers on Account of Debts That Benefitted Insiders (Original SOFA Question 8)

Question 8 of the SOFA requires a debtor's disclosure of any payments or transfers of property made within 1 year of the bankruptcy filing on account of a debt that benefitted an insider.

---

[88] See Exh. UST-1 (SOFA, Question 5).

[89] Id.

[90] See Exh. UST-1 (SOFA, Question 7).

[91] See id.; Joint Stipulations ¶¶ 64, 67, and 70.

[92] See Exh. UST-1 (SOFA, Question 7); Joint Stipulations ¶ 64.

The instructions for the question explain that payments on debts guaranteed or cosigned by an insider must be included.[93]  In response to Question 8, the Debtors averred that that they made no such payments.[94]

### 4.    Prepetition Sales and Transfers of Property Outside of the Ordinary Course of Business (Original SOFA Question 18)

Question 18 of the SOFA requires a debtor's disclosure of any sales, trades or other transfers of any property to anyone, other than property transferred in the ordinary course of the debtor's business or financial affairs, within 2 years of the bankruptcy filing.[95]

In response to Question 18, the Debtors disclosed the February 2019 Via Sonoma property transfer, but identified the transferee as an "unknown third party."  In relation to such transfer, the Debtors disclosed that they received $19,301.73 in net sales proceeds and $5,400 in real estate commissions.[96]  The Debtors also disclosed the February 2019 Winnpage property transfer by deed in lieu of foreclosure.  However, the Debtors disclosed the transferee as American instead of YYP Funds, Inc.[97]

### 5.    Business Ownership and Connections (Original SOFA Question 27)

Question 27 of the SOFA requires a debtor's disclosure of any businesses owned by the debtor within 4 years of the bankruptcy filing, and any businesses as to which the debtor had one or more of the following connections within such time frame: as a sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time; as a member of a limited liability company or limited liability partnership; as a partner in a partnership; as an officer, director, or managing executive of a corporation; or as an owner of at least 5% of the voting or

---

[93] *See* Exh. UST-1 (SOFA, Question 8).

[94] *Id.*

[95] *See* Exh. UST-1 (SOFA, Question 18).

[96] *See id.*

[97] *See id.*

equity securities of a corporation.[98]  In response to Question 27, the Debtors disclosed only SRE and Pinnacle.[99]

### I.      The Debtors Reaffirm the Accuracy of Their Disclosures at the Section 341 Meeting of Creditors

Upon the commencement of the Bankruptcy Case, Marilyn Garner (the "**Chapter 7 Trustee**") was appointed as the chapter 7 trustee of the Debtors' bankruptcy estate.[100]  On April 24, 2019, roughly two months after the filing of the Original Schedules and Original SOFA, the Chapter 7 Trustee conducted the meeting of creditors statutorily mandated by section 341 of the Bankruptcy Code.  Both of the Debtors, along with their attorney, Maskell, appeared at the meeting.[101]

After taking an oath to testify truthfully, the Debtors confirmed that they had had an opportunity to read and review the Original Schedules and Original SOFA before they were signed and filed with the Court and that they were aware of the fact that the two documents had been signed under penalty of perjury.  Thereafter, the Debtors further confirmed that, other than needing to add some creditors to their Schedules, they were unaware of any additions or corrections that needed to be made to the Original Schedules and Original SOFA.[102]

Based upon the financial disclosures provided by the Debtors pursuant to the Original Schedules and Original SOFA and the testimony provided by them at the section 341 meeting of creditors, the Chapter 7 Trustee designated the Bankruptcy Case as a "no asset" case on May 6, 2019, indicating that the proceeds of all non-exempt assets of the bankruptcy estate were projected

---

[98] *See* Exh. UST-1 (SOFA, Question 27).

[99] *See id*.

[100] Joint Stipulations ¶ 2.

[101] *See* Joint Stipulations ¶ 8.

[102] *See* Exh. UST-7 (recording of § 341 meeting of creditors).

to be insufficient to enable any distribution on any allowed claims after the payment of administrative expenses.[103]

**J.       The U.S. Trustee Examines the Debtors Pursuant to Bankruptcy Rule 2004**

Following the initial meeting of creditors and the filing of complaints against the Debtors by certain of the Individual Investors to object to the Debtors discharge and/or the dischargeability of debts owed to them,[104] the U.S. Trustee determined to pursue additional discovery with respect to the Debtors' assets, liabilities and financial affairs.  On June 25, 2019, the U.S. Trustee filed a motion for an examination of the Debtors pursuant to Bankruptcy Rule 2004.[105]

Pursuant to the motion, the U.S. Trustee requested that he be granted authority to both examine the Debtors under oath in accordance with Bankruptcy Rule 2004 and to require the Debtors to produce certain documents in advance of the examination, including bank statements for all of the financial accounts, both business and personal, over which the Debtors had signatory authority between 2018 and 2019; profit and loss statements, ledgers, and other financial documents issued by the Debtors and any businesses under their control or management (including Pinnacle and Renovations) for calendar years 2016, 2017, and 2018; and in relation to the Project Properties, settlement statements for both the purchase and sale of each Project Property, loan documents for monies borrowed by the Debtors or any of their businesses to finance the purchase and/or renovation of each Project Property, an accounting of monies spent to renovate each Project Property, and an accounting of how the sales proceeds from each Project Property were distributed.[106]  The Debtors agreed to the Bankruptcy Rule 2004 relief requested by the U.S.

---

[103] *See* Case No. 19-40831 (5/6/2019 docket entry).

[104] *See, e.g.*, Exhs. UST-2 and UST-3.

[105] *See* Exh. UST-4 (first 10 pages); *see also* Fed. R. Bankr. P. 2004(b) (detailing the permissible scope of a Bankruptcy Rule 2004 examination).

[106] *See* Exh. UST-4 (Exhibits A and B to motion).

Trustee and on June 28, 2019, the Court entered an agreed order requiring the Debtors to appear for their Bankruptcy Rule 2004 examination and to produce the above-described documents in advance of the examination (the "**Agreed 2004 Order**").[107]

In relation to the required production, the Debtors produced, among other things, the settlement statements reflecting the purchase price of each of the Project Properties, an accounting of all monies purportedly spent to renovate each of the Project Properties (the "**Original Accounting**"), and the settlement statements reflecting the sales price of each of the Project Properties. A summary of such information is set out below:[108]

| Project Property | Purchase Date | Purchase Price | Renovation Expenditures | Sale Date | Sales Price |
|---|---|---|---|---|---|
| Marquita[109] | 6/27/2016 | $300,000 | $510,701.94 | 2/08/2018 | $700,000 |
| Tangleglen[110] | 8/03/2016 | $330,000 | $177,862.27 | 4/19/2018[111] | $724,000 |
| Harvest Hill[112] | 3/10/2017 | $415,000 | $162,321.52 | 3/23/2018 | $535.000 |
| Clearwater[113] | 3/31/2017 | $400,000 | $207,126.51 | 9/14/2018[114] | $356,250 |
| Groveland[115] | 6/27/2017 | $325,000 | $33,974.39 | *foreclosure* | *Foreclosure* |
| Laurel Valley[116] | 7/21/2017 | $315,000 | $145,313.68 | 1/30/2018 | $451,000 |
| Winnpage[117] | 3/26/2018 | $528,000 | $51,815.87 | *deed in lieu* | *deed in lieu* |
| Via Sonoma[118] | 6/15/2018 | $110,000 | $47,040.08 | 2/11/2019 | $189,000 |
| | Total Renovation Expenditures: | | $1,336,156.26[119] | | |

---

[107] *See id.* (last 2 pages); *see also* Joint Stipulations ¶ 27 (PTO, at pp.21-22).

[108] *See also* Joint Stipulations ¶ 33.

[109] *See* Exh. UST-33.

[110] *See* Exh. UST-32.

[111] The parties have stipulated to a sale date of April 16, 2018. However, the closing disclosure reflects a closing date of April 19, 2018. *See id.* (p.7).

[112] *See* Exh. UST-34.

[113] *See* Exh. UST-35.

[114] The parties have stipulated to a sale date of September 14, 2019. However, the closing disclosure reflects a closing date of September 14, 2018. *See id.* (p.3).

[115] *See* Exh. UST-36; *see also* Joint Stipulations ¶ 33 (stipulating to the foreclosure of this property).

[116] *See* Exh. UST-37.

[117] *See* Exh. UST-39; *see also* Joint Stipulations ¶ 33 (stipulating to transfer by deed in lieu of foreclosure).

[118] *See* Exh. UST-38.

[119] *See also* Joint Stipulations ¶ 28 (PTO, at p.22).

On August 8, 2019, the Debtors appeared for their examination.  The Debtors were accompanied by Maskell, their attorney.  After being sworn, each of the Debtors reaffirmed under oath their involvement in the preparation of the Original Schedules and the Original SOFA[120] and at no time during their respective examinations did either of the Debtors indicate that any of the information included within the Original Schedules and Original SOFA was incorrect or incomplete (other than with respect to the need to add certain creditors to the Schedules). Additionally, at no time during their respective examinations did either of the Debtors indicate that the Original Accounting was inaccurate or incomplete.

### K.      *The Debtors Amend Their Original Schedules*

On August 21, 2019, roughly two weeks after the Bankruptcy Rule 2004 examination, the Debtors filed an amended Schedule E/F ("**Amended Schedule E/F**") to include the creditors that that the Debtors had indicated needed to be added.[121]  The Debtors made no other changes to the Original Schedules.

### L.      *The U.S. Trustee Files Suit Triggering the Debtors' Filing of an Amended SOFA and the Production of a New Accounting of Renovation Expenses*

On September 23, 2019, the U.S. Trustee initiated this adversary proceeding with the filing of his Complaint against the Debtors.  Nearly two months later, on November 18, 2019, having had the benefit of reviewing the U.S. Trustee's allegations with respect to the inaccurate and incomplete information included within the Original Schedules and Original SOFA, the Debtors filed an amended SOFA (the "**Amended SOFA**").[122]  The Debtors did not further amend the Original Schedules.

---

[120] *See* Exhs. UST-8 (pp.52, 55-56) and UST-9 (pp.17, 28).

[121] *See* Exh. UST-5 (adding debts owed to Atmos Energy, City of Mesquite, CMI Credit, Nationwide Recovery Systems, NTTA, Sunrise Ridge Owners Association, Town of Flower Mound, and TXU, and adding notice parties related to Atmos Energy and the Town of Flower Mound).

[122] Exh. UST-6.

Pursuant to the Amended SOFA, which was also signed by the Debtors as truthful under penalty of perjury,[123] the Debtors reiterated the same responses to SOFA Questions 4, 5, 8, 18, and 27 as included within the Original SOFA.   Only the response to Question 7 – requiring the disclosure of payments made within 1 year of the bankruptcy filing on debts owed to an insider – was modified.   The relevant differences between the response to SOFA Question 7 of the Original SOFA and the response to Question 7 of the Amended SOFA are set out below:

| Insider | Disclosed Payments (Original SOFA) | Disclosed Payments (Amended SOFA) |
|---|---|---|
| Allen Mimms | $1,000 | $2,000 |
| Ronnie Mimms | $2,000 | $18,000 |
| LOF Enterprises | No Disclosure | $21,600 |

Separately, in connection with a deadline for the exchange of trial exhibits in the Summer of 2020, the Debtors produced to the U.S. Trustee additional records and a new accounting of expenses incurred in relation to the renovation of each Project Property (the "**Revised Accounting**").   The differences between the Original Accounting and Revised Accounting are set out below:[124]

| Project Property | Revised Accounting (Summer 2020) | Original Accounting (Summer 2019) | Difference |
|---|---|---|---|
| Marquita | $707,167.51 | $510,701.94 | $196,465.57 |
| Tangleglen | $552,961.07 | $177,862.27 | $375,098.80 |
| Harvest Hill | $211,669.97 | $162,321.52 | $49,348.45 |
| Clearwater | $305,704.28 | $207,126.51 | $98,577.77 |
| Groveland | $37,947.31 | $33,974.39 | $3,972.92 |
| Laurel Valley | $190,152.06 | $145,313.68 | $44,838.38 |
| Winnpage | $59,227.14 | $51,815.87 | $7,411.27 |
| Via Sonoma | $56,702.97 | $47,040.08 | $9,662.89 |
| **Totals:** | **$2,121,532.31** | **$1,336,156.26** | **$785,376.05** |

---

[123] *See id.* (last page).

[124] *See* Joint Stipulations ¶¶ 29 and 30 (PTO, at p.22).

*DISCUSSION*

Section 727(a) of the Bankruptcy Code mandates that the court grant a chapter 7 debtor a discharge unless one of the enumerated grounds for the denial of the discharge applies.[125] In considering such enumerated grounds, it is a "basic principle of bankruptcy that exceptions to discharge must be strictly construed against [an objecting creditor or trustee] and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[126] Accordingly, the party objecting to the grant of a chapter 7 discharge bears the burden of proving all of the elements of an exception to the discharge under section 727(a).[127]

## A. Section 727(a)(4)(A) – False Oath or Account

The Plaintiffs first object to the Debtors' discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code. Section 727(a)(4)(A) provides for the denial of a discharge to a debtor who "knowingly and fraudulently, in or in connection with the [bankruptcy] case … made a false oath or account."[128] To prevail on an objection to discharge under section 727(a)(4)(A), the objecting party must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath in, or in connection with, the bankruptcy case; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.[129] Once the objecting party has established a prima

---

[125] *See* 11 U.S.C. § 727(a) ("The court *shall* grant the debtor a discharge, unless [one or more of twelve different bases for the denial of a discharge applies]") (emphasis added); *see also Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 91 (5th Cir. 2016); *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 587 (Bankr. N.D. Tex. 2006).

[126] *Packer*, 816 F.3d at 91 (quoting *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)); *see also Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 356 (Bankr. N.D. Tex. 2010).

[127] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005); *Crumley*, 428 B.R. at 356.

[128] 11 U.S.C. § 727(a)(2)(A).

[129] *Packer*, 816 F.3d at 94; *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

facie case under section 727(a)(4)(A), the burden shifts to the debtor to present evidence that the debtor is innocent of the charged offense.[130]

The Plaintiffs point to two categories of false oaths that the Debtors allegedly knowingly and fraudulently made in connection with the Bankruptcy Case: (a) those with respect to the information disclosed in and omitted from the Original Schedules, Original SOFA and Amended SOFA; and (b) those with respect to the Original Accounting supplied to the U.S. Trustee in response to the Agreed 2004 Order.  Each of these categories is considered in turn.

### 1.    The Original Schedules and Original and Amended SOFA

"The bankruptcy schedules and statement of financial affairs of a debtor serve a vital role for creditors in a bankruptcy case, in that they ensure that adequate and truthful information is available to trustees and creditors … without the need for further investigation to determine whether or not the information is true and correct."[131]  Hence, a debtor has "a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all requests."[132]  Recognizing as much, a false statement or omission made by the debtors in their schedules or statement of financial affairs is a false oath sufficient to justify the denial of a discharge under section 727(a)(4)(A) of the Bankruptcy Code.[133]

Here, the Plaintiffs assert that the Debtors made false oaths in verifying under penalty of perjury that all of the information set forth within the Original Schedules, the Original SOFA and the Amended SOFA was true and correct.  They highlight the following alleged inaccuracies and omissions within such filings:[134]

---

[130] *Duncan*, 562 F3d at 696.

[131] *Mullen v. Jones (In re Jones)*, 445 B.R. 677, 726-27 (Bankr. N.D. Tex. 2011); *see also Beaubouef*, 966 F.2d at 179.

[132] *Wells*, 426 B.R. at 599 (quoting *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991)).

[133] *Beaubouef*, 966 F.2d at 178; *Duncan*, 562 F.3d at 695.

[134] *See* PTO, at pp.3-8 (U.S. Trustee's contentions and Taylor's adoption of the same).

- The omission of Pinnacle and Taylor as codebtors on Schedule H of the Original Schedules.

- The omission of Renovations as an employer of Lindeman on Schedule I of the Original Schedules.

- In relation to Questions 4 and 5 of the Original and Amended SOFAs, the understatement of all gross income received by the Debtors between 2017 and the Petition Date, pointing specifically to the Debtors' failure to include (i) a substantial portion of the roughly $1.3 million in funds deposited into the Personal Accounts within 1 year of the Petition Date, including $19,301.73 in net proceeds received from the sale of the Via Sonoma property, and (ii) the indirect income derived from the personal expenses that Pinnacle paid for the benefit of the Debtors during the Debtors' rent-free occupation of the Tangleglen property between February 2017 and March 2018.

- In relation to Question 7 of the Original SOFA, the understated payments to insiders Allen Mimms and Ronnie Mimms and omitted payment to LOF Enterprises within 1 year of the Petition Date.

- In relation to Question 8 of the Original and Amended SOFAs, the omission of any payments or transfers to creditors of Pinnacle within 1 year of the Petition Date.

The Debtors do not dispute that the Original Schedules, Original SOFA and Amended SOFA constitute statements made under oath in connection with the Bankruptcy Case or that such statements were material to the Bankruptcy Case.[135] Their focus is on the remaining elements of the § 727(a)(4)(A) objection. Therefore, each of these remaining elements are considered in turn.

### (a) Falsity of the Statements

*Schedule H of the Original Schedules*. Starting with Schedule H of the Original Schedules, the evidence clearly established that, as of the Petition Date, Pinnacle was liable for amounts owed on the Individual Loans, Merchant Loans, and the Pavillion line of credit and that the Debtors (or only Lindeman in certain cases) were also liable for such debts by virtue of the Individual Loan Guarantees, the Merchant Loan Guarantees, and the Pavillion Line Guaranty. As of the Petition

---

[135] "The subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Pratt*, 411 F.3d at 566 (quoting *Beaubouef*, 966 F.2d at 178)). Applying this definition of "materiality," all of the above-referenced errors and omissions in the Original Schedules and Original and Amended SOFAs are clearly material to the Bankruptcy Case because they all relate to the Debtors' business transactions and/or concern the Debtors' business dealings or disposition of the Debtors' property.

Date, Taylor was also liable for the Pavillion line of credit debt by virtue of the Taylor Guaranty. Thus, because of these joint liabilities, both Pinnacle and Taylor were codebtors of the Debtors as of the Petition Date and the Debtors' sworn statement in Schedule H that they had no codebtors was false.

_Schedule I of the Original Schedules_.  Turning next to Schedule I of the Original Schedules, the Debtors assert that their omission of Renovations as an employer of Lindeman as of the date of the filing of such schedule on February 28, 2019, was not false because Lindeman was no longer employed by Renovations as of such date.  In relation to such assertion, while Lindeman conceded at trial that Renovations had previously paid him as an employee in 2018, he claimed that Renovations was no longer operating in early 2019.  Other evidence at trial, however, painted a very different picture.  For example, a mere 9 days prior to the Petition Date, Lindeman, himself, signed the Winson Contract on behalf of Renovations.[136]  And while Lindeman attempted to then explain away the contract by claiming that it was transitioned from Renovations to other contractors as a result of the Debtors' bankruptcy filing (which, of course, makes little sense), even after the Petition Date, Lindeman was continuing to promote Renovations' construction services in advertising flyers circulated to interested parties.[137]  Moreover, when Gordon was questioned about Lindeman's employment status with Renovations, Gordon attempted to sidestep the issue altogether by suggesting that it was irrelevant because "he wasn't making any money."  The Court finds the Debtors' testimony with respect to Lindeman's employment status with Renovations to not be credible.  To the contrary, based upon the evidence presented, the Court finds that the Plaintiffs have satisfied by a preponderance of the evidence that Lindeman was employed by Renovations as of the Petition Date (whether successfully making money or not) and that, as a

---

[136] _See_ Exh. UST-41.

[137] _See_ Exh. UST-58 (May 2019 advertising flyer).

result, the Debtors' omission of any reference to Renovations on Schedule I caused the employment disclosures in Schedule I to be false.

*Questions 4 and 5 of the Original and Amended SOFAs*.  Third, in relation to the Debtors' responses to Questions 4 and 5 of the Original and Amended SOFAs, the Debtors claim that, other than the amounts of income actually disclosed in response to Question 4 of the Original and Amended SOFAs (which are attributable to legacy insurance sales commissions and Renovations wages in the case of Lindeman, and to real estate commissions and paralegal compensation in the case of Gordon), none of the roughly $1.3 million that was deposited into the Debtors' Personal Accounts within one year of the Petition Date and none of the amount of the Debtors' personal expenses paid by Pinnacle during their occupancy of the Tangleglen property constituted income. They take this position on the basis that all of the amounts had a connection to the Debtors' real estate business and none of the amounts allegedly constituted "gains derived from dealings in property;" therefore, none of the amounts (according to the Debtors) constituted gross income pursuant to the gross income provisions of 26 U.S.C. § 61(a)(3) (part of the Internal Revenue Code).[138]  The Debtors are incorrect in their reasoning.

First, nothing within the instructions to SOFA Questions 4 and 5 refers to the Internal Revenue Code.  In fact, following the instructions of Question 4 to "[f]ill in the total amount of income you received from all jobs and all businesses, including part-time activities," the instructions to Question 5 clearly and unambiguously direct a debtor to disclose all other forms of income "regardless of whether that income is taxable."[139]  In light of such direction, "[t]he meaning

---

[138] *See* PTO, at p.9 (Debtors' contentions).

[139] *See* Exh. UST-1 (Original SOFA, Questions 4 and 5); *see also Crumley*, 428 B.R. at 360 (explaining that "income" for purposes of the SOFA "is intended to reach many distributions beyond the scope of gross income as defined by the Internal Revenue Code").

of income for the Statement of Financial Affairs should be broadly construed."[140]  Moreover, even if 26 U.S.C. § 61 had some bearing upon the disclosure of income for SOFA purposes, nothing within 26 U.S.C. § 61 limits income in the case of a real estate business to only realized gains upon the disposition of property.  Instead, 26 U.S.C. § 61 provides that "[e]xcept as otherwise provided within this subtitle, gross income means *all* income *from whatever source derived*, *including (but not limited to)* the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items; (2) Gross income derived from business; (3) Gains derived from dealings in property; [and a variety of other categories of income]."[141]  In other words, "gains derived from dealings in property" is but only one of the specified types of income that make up gross income for Internal Revenue Code purposes.  As reflected above, another type of income specified within 26 U.S.C. § 61 is "gross income derived from business," which the Debtors conveniently fail to mention in their argument.[142]

With the foregoing in mind, simply comparing the aggregate amount of all income from 2017 through the Petition Date reported by the Debtors ($293,783) plus the total amount of cash on hand and on deposit in the Debtors' Personal Accounts as of the Petition Date ($9,071.52), each as reported by the Debtors, to the roughly $1.3 million in receipts received by the Debtors within one year of the Petition Date is evident of the fact that the Debtors grossly underreported their income in response to Question 4 and/or 5 of the Original and Amended SOFAs.  In this regard, Gordon acknowledged that during the time period in which the Debtors took over the home renovations and resale business and used their Personal Accounts to conduct such business, both

---

[140] *Neary v. Gauger (In re Gauger)*, Adversary No. 15-05014, 2016 WL 3475305, at *3 (Bankr. N.D. Tex. June 17, 2016).

[141] 26 U.S.C. § 61(a) (emphasis added).

[142] *Id*. § 61(a)(2).

construction draws and new Investor Loan proceeds were deposited into the Personal Accounts.[143] At a very minimum, both of the Debtors conceded that in February 2019, prior to the bankruptcy filing, they received $19,301.73 in net sales proceeds from their resale of the Via Sonoma property (in addition to the $5,420 in real estate commissions earned by Gordon) and that none of the proceeds were reported as income in response to Questions 4 and 5 of the Original and Amended SOFAs. Consequently, the Debtors' sworn statements in the Original and Amended SOFAs with respect to total income received between 2017 and the Petition Date was false.

*Question 7 of the Original SOFA*. Fourth, in relation to the Debtors' response to Question 7 of the Original SOFA, the Debtors' subsequent filing of the Amended SOFA to correct the amount of insider payments made to Allen Mimms (from $1,000 to $2,000) and Ronnie Mimms (from $2,000 to $18,000) and to add LOF Enterprises (from $0 to $21,600) is evidence, in and of itself, of the falsity of the insider payment disclosures made within the Original SOFA.

*Question 8 of the Original and Amended SOFAs*. Finally, in relation to the Debtors' response to Question 8 of the Original and Amended SOFAs requiring the disclosure of all payments or transfers of property made within 1 year of the bankruptcy filing on account of a debt that benefitted an insider, in addition to the numerous Pinnacle contractors paid during such period,[144] the Debtors made payments to the following, among other, Individual Investors on account of their outstanding Pinnacle Investor Loans: Cory Mull, Allen Mimms, Ronnie Mimms, Stermer (LOF Enterprises), Jim Townsend and Art Martinez.[145] Each of these payments had the effect of reducing the amount owed by Pinnacle and therefore benefitted Pinnacle, an insider of the Debtors. Consequently, the Debtors' sworn statements in the Original and Amended SOFAs

---

[143] *See* Exh. UST-9 (p.50).

[144] *See* Exhs. UST-8 (pp.48, 70) and UST-9 (pp.36-37, 39, 41-42); *see also generally* Exhs. UST-22, UST-23, and UST-24.

[145] *See* Joint Stipulations ¶¶ 65, 68, 72, and 78; Exh. UST-24 (pp.32, 35).

that no payments or transfers of property were made within 1 year of the bankruptcy filing on account of a debt that benefitted an insider were false.

### (b) *Knowledge of the Falsity*

Next, with respect to each of the statements determined to be false, the Debtors claim that they had no knowledge of the falsity at the time of making the statement. The Plaintiffs assert otherwise. "Knowledge of falsity may be demonstrated by circumstantial evidence, and by direct evidence where the debtors had knowledge of their current and former business affairs."[146] "The complaining party need not prove that the debtor consciously chose to omit or misstate information, only that the debtor knew the truth when the omission or misstatement was made."[147]

*Schedule H of the Original Schedules*. In the case of the Schedule H codebtor disclosures, the Debtors claim that they did not know that they had any codebtors because they had a misunderstanding of the meaning of "codebtor."[148] More specifically, Gordon explained that the Debtors believed that in order for two parties to qualify as codebtors on a debt, the parties had to have co-signed the underlying debt instrument (*e.g.*, the promissory note). Thus, because the Debtors did not co-sign any of the Pinnacle promissory notes and did not sign the Taylor Guaranty, and because neither Pinnacle nor Taylor co-signed any of the Debtors' Individual Loan Guarantees or the Pavillion Line Guaranty, the Debtors (according to Gordon) did not believe that Pinnacle and Taylor were codebtors. Additionally, in the case of Pinnacle alone, Gordon further explained that because Pinnacle purportedly had no remaining assets as of the Petition Date, then Pinnacle would not have qualified as a codebtor in any event because only the Debtors had the ability to pay the debts. The Court finds neither of these explanations to be credible.

---

[146] *Crumley*, 428 B.R. at 366.

[147] *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862 n.1 (5th Cir. 2004).

[148] *See* PTO, at p.15 (Debtors' contentions).

The instructions to Schedule H provide in simple terms that "[c]odebtors are people or entities who are also liable for any debts you may have."[149]  Nothing within the instructions requires a person or entity to be a co-signor on a debt instrument executed by the debtor in order to qualify as a codebtor of the debtor, and nothing within the instructions relieves the debtor of the obligation to list a codebtor if the debtor believes the codebtor to be incapable of satisfying the debt.

Here, the Debtors fully understood the concept of co-liability for a debt given the volume and terms of the Individual Loan Guarantees and Merchant Loan Guarantees they executed in order to obtain financing for Pinnacle.  Had they truly believed that they were not jointly liable with Pinnacle on any of the Individual Loans and Merchant Loans, the Debtors would not have listed the nearly $1.6 million in guaranteed Pinnacle debt obligations in Schedule E/F of the Original Schedules and in Amended Schedule E/F.  The Court finds that the Debtors knew that the information disclosed in Schedule H was false.

*Schedule I of the Original Schedules*.  In the case of the omitted Lindeman employment disclosures in Schedule I of the Original Schedules, as previously indicated, the Court did not find credible the Debtors' claim that Lindeman was no longer employed by Renovations as of the Petition Date.  At best, Gordon suggested that she did not believe that the employment had to be disclosed because Lindeman was purportedly not making any money.  But that does not change the fact that the Debtors knew about the employment as of the Petition Date.  As such, the Court finds that the Debtors knew that the information disclosed in Schedule I was false.

*Questions 4 and 5 of the Original and Amended SOFAs*.  Turning to the income disclosures in response to Questions 4 and 5 of the Original and Amended SOFAs, the Debtors rely upon the above-described misapplication of 26 U.S.C. § 61(a)(3) to claim that they had no knowledge of

---

[149] *See* Exh. UST-1 (Schedule H, introductory instructions).

the falsity of their disclosures.  Such misapplication, however, does not change the fact that the Debtors knew about the truth of their income at the time of the disclosures.  The Debtors simply chose to withhold such information on the basis of their purported misunderstanding of the concept of reportable income.  In short, the Court finds that the Debtors knew that the information disclosed in response to Questions 4 and 5 of the Original and Amended SOFAs was false.

_Question 7 of the Original SOFA_.  With respect to the underreported and omitted payments to insiders in relation to Question 7 of the Original SOFA, the Debtors raise two arguments.  First, in the case of the underreported payments to insiders Allen and Ronnie Mimms, at the time of the filing of the Original SOFA, Gordon claims to have understood the time frame of "[w]ithin 1 year before you filed for bankruptcy" to mean only the portion of the year in which the Bankruptcy Case was filed – _i.e._, January 1, 2019, through February 28, 2019.  The Court does not find Gordon's explanation to be credible.  Indeed, when Lindeman was questioned about the time frame, he testified that he understood the period to be the 12-month period preceding the bankruptcy filing.  Either way, the Debtors had knowledge of the full amount of the payments made within the one-year period at the time of the filing of the Original SOFA.

Next, in the case of the omitted payments to LOF Enterprises, the Debtors claim to have understood "insider" to mean only relatives and partners of the Debtors, thereby causing them to omit LOF Enterprises from the disclosure.  Once again, the Court does not find the Debtors' explanation to be credible.  First, the instructions to Question 7 of the SOFA explain that "_Insiders_ include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor."[150]  Second, if the Debtors truly believed that

---

[150] _See_ Exh. UST-1 (SOFA, Question 7) (emphasis in orig.).

an "insider" was only a relative or partner, then they would not have included payments to Cory Mull in the Original SOFA, inasmuch as he was merely a close friend of the Debtors.[151] Moreover, by virtue of the Debtors' listing of LOF Enterprises as an insider in response to Question 7 of the Amended SOFA, the Debtors have admitted that LOF Enterprises was and is an insider of the Debtors. And the Debtors had knowledge of the payments to LOF Enterprises at the time of the filing of the Original SOFA.

Based upon the foregoing, the Court finds that the Debtors knew that the information disclosed in response to Question 7 of the Original SOFA was false.

*Question 8 of the Original and Amended SOFAs*. Finally, in relation to the Debtors' nondisclosure of payments that benefitted an insider in response to Question 8 of the Original and Amended SOFAs, the collective introduction into evidence of bank records from the Personal Accounts, Investor Loan promissory notes, Merchant Loan agreements, and the Debtors' testimony with respect to the identity of various contractors used by Pinnacle and use of the Personal Accounts to make payments on Pinnacle obligations clearly established that the Debtors knew that they had made numerous payments within 1 year of the Petition Date on debts that benefitted Pinnacle, an insider, at the time of the filing of both the Original SOFA and the Amended SOFA. Accordingly, the Debtors knew that the information disclosed in response to Question 8 of the Original and Amended SOFAs was false.

### *(c) Fraudulent Intent*

Finally, relying again on their purported misunderstanding of terms and time periods discussed above, the Debtors claim that none of the false statements made by them in the Original Schedules, Original SOFA and Amended SOFA were made with the intent to mislead the U.S.

---

[151] Of note, payments to Cory Mull were excluded from the Amended SOFA, presumably on account of the Debtors' reassessment of Mr. Mull's insider status.

Trustee or any of the Debtors' creditors, nor were they made with reckless disregard for the truth. In other words, they simply chalk up the errors and omissions to forgivable mistakes on their part. The Plaintiffs again disagree.

An objecting party may prove fraudulent intent by showing either an actual intent to deceive on the part of the debtor or the debtor's reckless indifference to the truth.[152]  And while it has been recognized that "a discharge cannot be denied when items are omitted from the schedules by honest mistake,"[153] it has also been recognized that "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."[154]  Here, the Plaintiffs established a clear pattern of reckless disregard for the truth, if not actual deceptiveness, on the part of the Debtors in the submission of their sworn Original Schedules and Original and Amended SOFAs.

In the case of deceptiveness, collectively considered, each of the errors and omissions at issue involves or is related to the business and business operations of Pinnacle.  Noting that the Debtors scheduled their ownership in Pinnacle as having no value, the Debtors then effectively obfuscated the nature and extent of Pinnacle's business affairs and operations by failing to disclose Pinnacle as a codebtor on any debts, failing to disclose any income involving or related to the Pinnacle business, failing to fully disclose all payments to insiders associated with Pinnacle, and failing to disclose any payments on debts that benefitted Pinnacle.  In effect, just as they had previously done with SRE, the Debtors sought to cause Pinnacle to simply disappear in connection with moving all of the Pinnacle business elsewhere, including to non-debtor Renovations (an undisclosed continuing employer of Lindeman).  And in relation to the two renovation projects

---

[152] *Packer*, 816 F.3d at 95; *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.), *cert. denied*, 534 U.S. 1042 (2001).

[153] *Beaubouef*, 966 F.2d at 178; *see also Neary v. Harding (In re Harding)*, Adversary No. 14-03078, 2015 WL 222482, at *5 (Bankr. N.D. Tex. Jan. 14, 2015).

[154] *Duncan*, 562 F.3d at 695; *see also Crumley*, 428 B.R. at 366-67.

that the Debtors took over in their own name – Winnpage and Via Sonoma – the Debtors added to the obfuscation by falsely identifying the transferee of the Winnpage property as American instead of YYP Funds, Inc. and disclosing the transferee of the Via Sonoma property as "unknown third party" instead of Donald Tarver. Ultimately, based upon the disclosures provided by the Debtors, the Debtors were successful in convincing the Chapter 7 Trustee to designate the Bankruptcy Case as a "no asset" case in which there was no reason to delve into the possibility of undisclosed assets having a connection to the Debtors' ownership of Pinnacle (and Pinnacle's ownership of Renovations) or to the Debtors' transition of business from Pinnacle to the Debtors, and no reason to delve into the possibility of recoverable prepetition transfers having a connection to Pinnacle and/or the business of Pinnacle.

Moreover, the Debtors' continuing failure to remedy their errors and omissions in the Schedules and SOFA is a textbook example of the type of reckless disregard for the truth that has been found to constitute fraudulent intent.[155] Both of the Debtors participated in the preparation and review of the draft Schedules and SOFA. Then, the Debtors had the benefit of meeting with Maskell to go over the drafts before they were finalized, signed and filed. And while the Debtors attempt to, after-the-fact, shift some of the blame for the errors and omissions to Maskell on account of his purported cavalier attitude in the meeting and to the Lee Law Firm, more generally, in relation to the Via Sonoma net sales proceeds that were omitted from the Debtors' income disclosures, claiming that the sales information was provided to the firm with the expectation that the attorneys would figure out where to disclose such information, "[a] debtor's reliance on advice of counsel constitutes an excuse for [an error or omission] … only where his reliance is reasonable

---

[155] *See Beaubouef*, 966 F.2d at 178 (finding the existence of more than one falsehood, coupled with the failure to take advantage of the opportunity to clear up all errors and omissions when filing an amendment, to be sufficient to support a finding of reckless indifference to the truth and, thus, the requisite intent to deceive for purposes of § 707(a)(4)(A)).

and in good faith"[156] and where, as here, the Debtors had knowledge of all of the underlying information required to be disclosed and declared under penalty of perjury to having read the Original Schedules and the Original and Amended SOFAs and affirmed that the statements included therein were true and correct to the best of their knowledge, information and belief, it is neither reasonable nor in good faith to attempt to shift the blame to counsel. Instead, the Debtors "must accept responsibility for the information in [their] statements and schedules."[157] Moreover, the Debtors thereafter had the opportunity to remedy the errors and omissions in connection with or promptly after the section 341 meeting of creditors. They failed to do so. Finally, the Debtors had an opportunity to remedy the errors and omissions in connection with or promptly after their Bankruptcy Rule 2004 examinations. And, again, they failed to do so. Even after the U.S. Trustee commenced this action and the Debtors filed the Amended SOFA, the only errors and omissions remedied therein were in relation to the disclosure of payments on debts owed to insiders.[158]

Based upon the foregoing, the Court finds that the Plaintiffs have proven by a preponderance of the evidence that all of the above-described false statements in the Original Schedules and in the Original and Amended SOFAs were made by the Debtors with fraudulent intent. Correspondingly, having carried their burden of proving all other elements of their § 727(a)(4)(A) objection in relation to the Original Schedules and Original and Amended SOFAs,

---

[156] *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991).

[157] *Id.*; *see also Hibernia Nat'l Bank v. Perez*, 124 B.R. 704, 710 (E.D. La. 1991) ("[T]he advice of counsel is not a defense when it is transparently plain" that the information at issue is required to be disclosed in the Schedules or SOFA), *aff'd*, 954 F.2d 1026 (5th Cir. 1992).

[158] While the Debtors did, in fact, finally correct the errors and omissions with respect to insider debt payments in filing the Amended SOFA, the filing of the Amended SOFA did not thereby cleanse the Debtors from their prior false statements, particularly where the filing was not made until after the U.S. Trustee had initiated this litigation. *See Sholdra*, 249 F.3d at 382; *see also Jones*, 445 B.R. at 727-27 (the purpose of the Schedules and SOFA is to provide relevant information to the trustee and creditors "without the need for further investigation to determine whether or not the information is true and correct").

the Plaintiffs have successfully established grounds for the denial of the Debtors' discharge pursuant to § 727(a)(4)(A).

### 2.    *The Original Accounting*

For the sake of completeness, the Court will also consider the Plaintiffs' § 727(a)(4)(A) discharge objection to the extent predicated on the Original Accounting of expenses incurred in relation to the renovation of each Project Property.  In this regard, a false statement by a debtor at an examination conducted during the course of bankruptcy proceedings is sufficient to justify the denial of a discharge.[159]  The Plaintiffs assert that the Debtors made such a false statement in producing the Original Accounting, highlighting the falsity of the statement based upon the Debtors' subsequently-produced Revised Accounting which includes over $785,000 in additional expenses omitted from the Original Accounting.  The Debtors' primary focus in response to the Plaintiffs is on the elements of knowledge and fraudulent intent, claiming that upon engaging new counsel who encouraged the Debtors to look harder for relevant records, the Debtors discovered additional records that they had missed in connection with the Original Accounting.  They explain that they had moved multiple times over the years and overlooked the stored records substantiating the omitted expenses.

While the magnitude of the difference between the Original Accounting and Revised Accounting is astounding and, frankly, indicative of the Debtors' pattern of reckless disregard for the truth, a more fundamental issue must first be addressed – and that is whether a statement with respect to the accuracy of the Original Accounting was ever made by the Debtors under oath.  In this regard, while the U.S. Trustee highlights the fact that the Original Accounting was produced in accordance with the Agreed 2004 Order, no evidence was presented of the Debtors' verification of the accuracy of the Original Accounting *under oath* in connection with the production.

---

[159] *Duncan*, 562 F.3d at 695; *Beaubouef*, 966 F.2d at 178.

Additionally, the Court has not located any testimony within the transcripts of the Debtors' respective Bankruptcy Rule 2004 examinations whereby either of the Debtors clearly and unambiguously confirmed that the Original Accounting was both complete and accurate. As such, the Court finds that that the Plaintiffs have failed to establish grounds for the denial of the Debtors' discharge under § 727(a)(4)(A) to the extent predicated on the falsity of the Original Accounting.

**B.** *Section 727(a)(3) – Failure to Preserve Books and Records*

Finally, the Plaintiffs also object to the Debtors' discharge pursuant to section 727(a)(3) of the Bankruptcy Code. As relevant to the Plaintiffs' objection, section 727(a)(3) provides for the denial of a discharge to a debtor who has "failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such … failure to act was justified under all of the circumstances of the case."[160] To prevail on an objection to discharge under section 727(a)(3), the objecting party must satisfy the initial burden of proving by a preponderance of the evidence that (1) the debtor failed to keep and preserve financial records and (2) that the failure prevented the objecting party from ascertaining the debtor's business transactions or financial condition.[161] Once this initial burden is satisfied, then the burden shifts to the debtor to prove by a preponderance of the evidence that the inadequacy is "justified under all of the circumstances of the case."[162]

With the foregoing in mind, the Plaintiffs assert after the Debtors determined to conduct Pinnacle business out of their Personal Accounts, resulting in the commingling of Pinnacle funds with the Debtors' personal funds, the Debtors failed to keep and preserve adequate financial records of both their own transactions and those of Pinnacle to enable them to segregate the

---

[160] 11 U.S.C. § 727(a)(3).

[161] *Duncan*, 562 F.3d at 697; *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003).

[162] *Duncan*, 562 F.3d at 697; *Dennis*, 330 F.3d at 703.

Debtors' transactions from Pinnacle's transactions and obtain a clear picture of the Debtors' financial condition. Relying upon the Revised Accounting and the additional records produced in connection therewith, the Debtors dispute the Plaintiffs' contention, arguing that they have maintained and produced adequate financial records. They also attempt to justify their initial failure to produce all records to the U.S. Trustee by noting that their and Pinnacle's records had become disorganized in connection with multiple moves over the years, and that because neither of the Debtors has any training in bookkeeping or accounting, the records were not maintained in an orderly fashion.

"The adequacy of the debtor's records is determined on a case by case basis, using such considerations as the 'debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice.'"[163] In other words, "Section 727(a)(3) is not a prescription of a 'rigid standard of perfection' in record-keeping, but requires that the debtor 'present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past.'"[164] "The debtor's records must at least reasonably allow for reconstruction of the debtor's financial condition to meet the requirements of the Code."[165]

Here, the Debtors failed to obtain and retain sufficient written records to enable such a reconstruction. For example, the U.S. Trustee elicited testimony from Lindeman highlighting the lack of written records with respect to cash withdrawals made from the Personal Accounts. While

---

[163] *Duncan*, 562 F.3d at 697 (quoting *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 856 (Bankr. N.D. Tex. 2003)), *aff'd*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd*, 108 Fed. Appx. 993 (5th Cir. 2004).

[164] *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 499 (Bankr. N.D. Tex. 2006) (quoting *First Nat'l Bank of Claude, Texas v. Williams (In re Williams)*, 62 B.R. 590, 593 (Bankr. N.D. Tex. 1986)), *aff'd*, 386 B.R. 624 (N.D. Tex. 2008), *aff'd*, 309 Fed. Appx. 841 (5th Cir. 2009).

[165] *Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 478 (Bankr. W.D. Tex. 2004).

Lindeman explained that the cash withdrawals would have been to make cash payments to Pinnacle contractors while conducting business out of the Personal Accounts, Lindeman admitted that the cash withdrawal slips often provided no or little information about the cash's intended use, and that payments to contractors may or may not have been recorded.[166]   Additionally, while Lindeman claimed to have taken pictures of invoices as a means of recording certain of the cash payments,[167] he could not produce those records because he no longer possesses the cell phone on which they were taken.  As examples of the sums withdrawn by Lindeman in cash and cashiers' checks from the Pavillion 3285 Account are (a) a withdrawal of $10,200 in August 2018, (b) a withdrawal of $19,605 in September 2018, and (c) a withdrawal of $14,005 in October 2018.[168]

Separately, the U.S. Trustee also elicited testimony from Lindeman that while he remembered executing the Pavillion Line Guaranty in connection with obtaining the $100,000 line of credit for Pinnacle, he purportedly could not recall how the $100,000 was used and had no records that would substantiate the use.  Inasmuch as this was during a period of the Debtors' use of the Personal Accounts to conduct Pinnacle business and the use of the funds also has a bearing on the amount owed by the Debtors under the Pavillion Line Guaranty, the lack of any records is problematic.  While "[a] debtor's financial records need not contain 'full detail,' … 'there should be written evidence' of the debtor's financial condition."[169]  Even with respect to the untimely provided Revised Accounting, the U.S. Trustee highlighted the existence of a number of duplicate invoices within the documentation produced in support, thereby calling into question the completeness of the supporting documentation.

---

[166] *See also* Joint Stipulations ¶ 85.

[167] *See also* Joint Stipulations ¶ 84.

[168] See Joint Stipulations ¶ 82.

[169] *Packer*, 816 F.3d at 94 (quoting *Dennis*, 330 F.3d at 703)).

In short, the Court finds that the Plaintiffs successfully met their initial burden of proving that the Debtors failed to keep and preserve financial records and that such failure prevented the Plaintiffs from being able to reconstruct the Debtors' transactions and ascertain the Debtors' true financial condition.

Turning, then, to the question of whether the failure to keep and preserve such records was justified under all of the circumstances of the case, the Court finds that the Debtors have failed to meet their burden of showing such justification.  While the Debtors presented reasons for the delay in providing all preserved records to the U.S. Trustee, they failed to provide an explanation for the failure to obtain and maintain any records in relation to the undocumented cash withdrawals and the $100,000 Pavillion line of credit.

Consequently, the Court finds that the Plaintiffs have also successfully established grounds for the denial of the Debtors' discharge pursuant to § 727(a)(3).

### CONCLUSION

For all of the foregoing reasons, the Plaintiffs' objections to the grant of a discharge to the Debtors under 11 U.S.C. § 727(a) will be sustained and the Debtors will be denied such discharge. The Court will separately enter a final judgment in conformity herewith.

# # # END OF MEMORANDUM OPINION # # #